**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 21, 2014**

# In the Court of Appeals of Georgia

A13A2300. GRAVITT et al. v. BANK OF THE OZARKS.

MCMILLIAN, Judge.

In this suit on promissory notes and personal guaranties of the notes, Appellants Clarks Bridge Corners, LLC ("CBC"), J. Michael Smith, Dennis E. Gravitt, Corners Communities, LLC ("Corners Communities"), and Omega Leasing, LLC ("Omega") appeal from the trial court's order granting summary judgment to Appellee Bank of the Ozarks ("BOZ") and dismissing Appellants' counterclaims. Finding no error, we affirm.

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light

most favorable to the nonmovant." (Citation omitted.) *Davis v. VCP South, LLC,* 321 Ga. App. 503, 503 (740 SE2d 410) (2013). So viewed, the evidence shows that CBC acquired 9.58 acres of real property located in Hall County, Georgia (the "Property") in a transaction that closed on January 5, 2004 with the intention of developing it as a mixed-use commercial and residential development (the "Development"). At the time, CBC was owned by Corners Communities, which was in turn owned by Bill H. Barnett,[1] Gravitt, and Smith. CBC requested and received an initial draw of $625,273.75 on an approximately $1,800,000 acquisition, development and construction loan (the "Loan") provided by Chestatee State Bank ("Chestatee").

Because CBC was involved in other development and construction projects at the time it purchased the Property, it did not begin developing the Property until 2006. In 2006 and 2007, CBC continued to draw on the Loan to develop the Property in phases, while also obtaining construction loans to build-out individual units, which

---

[1] This appeal results from two separate loan collection actions filed by BOZ against Appellants herein and Bill H. Barnett. At the time of the transactions that are the subject matter of this appeal, Barnett no longer owned an interest in either CBC or Corners Communities but remained a guarantor of the obligations of some of the Appellants. Barnett consented to a judgment in favor of BOZ and is not a party to this appeal. Because the allegations of the remaining defendants in both of the underlying actions were essentially the same, the parties agreed to consolidate them into a single action, and the trial court's order was entered in the consolidated action granting relief against each of the Appellants.

loans were paid off as the units were sold.[2] CBC was able to close on 14 units within the Development in 2007. However, market conditions then began to deteriorate, and the Development faltered, with CBC only closing on the sale of five units in 2008 and 2009 and one in 2011. In late 2008, Chestatee required Corners Communities, Gravitt, and Smith to execute personal guaranties in connection with a renewal of the Loan.

As the economic downturn continued, Appellants and Chestatee reached an understanding that in order for Appellants to repay their obligations to Chestatee, CBC would need to complete the Development in order to sell more units or rent units until the market rebounded. By late 2009, Appellants were in default of their obligations to multiple lenders, including Chestatee. Chestatee encouraged Appellants to pay their obligations to it, assuring them it would work with them on the loans. After several meetings with Gravitt, Chestatee sent a letter dated February 23, 2010 (the "February 2010 Letter") to CBC, confirming the terms of a restructured deal. As part of the restructuring, Chestatee agreed to extend the terms of all outstanding loans for a period of 24 months and to issue further construction funding in order for CBC

---

[2] We include and refer to all subsequent loans and/or construction funding collectively as the Loan.

to complete several additional units within the Development. Appellants contend that the February 2010 Letter represented a continuation of certain "contractual" undertakings that had been entered into by Chestatee and Appellants during the course of Appellants' performance under the Loan, including an extension of the repayment term and the issuance of additional construction loans.

In reliance upon the restructured terms as evidenced in the February 2010 Letter, Gravitt convinced his wife to make a loan of $50,000, which allowed CBC to bring current all past-due interest to Chestatee. In the summer of 2010, Chestatee funded the additional construction loans necessary for CBC to finish the units referenced in the February 2010 Letter. CBC transferred ownership in those units to Appellant Omega, a leasing company owned by Gravitt. Chestatee required Omega to execute a guaranty with respect to the additional loans. When the appraisal on one unit did not come back at a value where Chestatee needed it to be, it requested that CBC sign an internal sales note between CBC and Omega for $50,000, and Gravitt obliged. CBC also attempted to refinance a different unit into Omega, but Brian Huff, the Chestatee loan officer assigned to Appellants' loans, informed Gravitt that it would take several thousand dollars at closing to refinance the loan, which CBC was unable to pay. According to Appellants, in the fall of 2010, Chestatee began reneging

4

on its promises, including a promise to provide further construction funding to complete other units not encompassed within the February 2010 Letter.

On December 17, 2010, the Georgia Department of Banking and Finance closed Chestatee, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for Chestatee, thereby acquiring its assets, including the Appellants' loans. The FDIC entered into an Insured Deposit Purchase and Assumption Agreement through which Chestatee assets were transferred to BOZ. Appellants, unsure how to proceed, worked to meet with various BOZ employees, including Huff, who stayed on through the transfer. In January 2011, Gravitt learned that BOZ would not be supportive of CBC's attempts to rent completed units, and that any unit rented (as opposed to sold) by CBC would be converted by BOZ to a 6% interest rate and a 15-year amortization schedule. Appellants contend that this new policy was contrary to oral commitments made to them by Chestatee and effectively put CBC out of the rental business by increasing the monthly payments that would be due for each rented unit.

As Appellants continued to discuss with BOZ the commitments that had been made by Chestatee, they were told that BOZ would not proceed based on those promises. In March 2011, Gravitt told Huff that CBC had held off on paying the 2010

real property ad valorem taxes for the Property with the understanding that the same would be funded as part of a unit completion draw. In April 2011, Huff notified Gravitt that BOZ was declaring the Appellants' outstanding loans in default as a result of CBC's failure to pay those taxes in a timely manner. BOZ issued a default letter to CBC on May 5, 2011 regarding its outstanding balance of $628,908.31 and a separate default letter to Omega on October 5, 2011 regarding its outstanding balance of $469,558.06. Following initiation of the collection actions, Appellants answered, generally denying their indebtedness as claimed by BOZ, and asserted counterclaims for breach of contract, promissory estoppel, unjust enrichment and declaratory relief, each based on alleged modifications of the Loan and its terms. Following discovery, BOZ filed motions for summary judgment against all Appellants and motions to dismiss their counterclaims against it. After consolidating the two actions, the trial court granted all motions in favor of BOZ, finding that Appellants' defenses were barred pursuant to the doctrine announced in *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447 (62 SCt 676, 86 LE 956) (1942), and their counterclaims failed under the Financial Institutions Reform, Recovery and Enforcement Act, 12 USC § 1821 (d) (13) (D). This appeal followed.

6

1. In their first enumeration of error, Appellants argue that the trial court erred in relying on the *D'Oench* doctrine to find that Chestatee's promises and assurances were not relevant in defending against BOZ's collection actions. Appellants urge this Court to find that Chestatee's promises and actions, portions of which were memorialized in the February 2010 Letter, constituted a binding contract which was then binding on BOZ as its successor. However, this is exactly the type of scenario that the *D'Oench* doctrine was developed to address. See, e.g., *FDIC v. Hamilton*, 939 F2d 1225, 1228 (5th Cir. 1991) (This "estoppel doctrine bars defenses or claims . . . [that] are based on unrecorded or secret agreements that alter the terms of facially unqualified obligations."). The *D'Oench* doctrine, as established by the United States Supreme Court, "protects bank depositors and federal guarantors of banks by prohibiting reliance on any agreements which are not of record and which would have the effect of misleading creditors or the public authority." (Citation omitted.) *Fed. Financial Co. v. Holden*, 268 Ga. 73, 74 (485 SE2d 481) (1997). Therefore, "oral agreements between debtors and failed banks will not be enforced against banking authorities," and this "protection extends not only to the federal guarantor, but to assignees such as [BOZ]." (Citation and punctuation omitted.) Id.; see also *First Union Nat. Bank of Fla. v. Hall*, 123 F3d 1374, 1379 (III) (B), n. 8 (11th Cir. 1997)

(explaining that the *D'Oench* doctrine has been expanded to protect entities to whom the FDIC has transferred assets of the failed bank).

Moreover, it is not sufficient that any written agreement merely be on file in the bank's records at the time of an examination by federal and state bank examiners. *Langley v. FDIC*, 484 U.S. 86, 92 (108 SCt 396, 98 LE2d 340) (1987).[3] The agreement must also be executed and become a bank record contemporaneously with the making of the note after approval by officially recorded action of the bank's board or loan committee. Id. "These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." Id.

This Court recently addressed a similar situation in which a bank agreed to renew, extend, and modify a loan various times over the course of several years, with a final maturity date of October 29, 2009. *Hewitt v. Comm. & S. Bank*, 324 Ga. App. 713 (751 SE2d 513) (2013). Just three months after that loan was due, the bank was

---

[3] In *Langley*, the United States Supreme Court analyzed the scope of the Federal Deposit Insurance Act of 1950 at 12 USC § 1823 (e), which is a codification of the *D'Oench* doctrine. See, e.g., *Bufman Org. v. FDIC*, 82 F3d 1020, 1023 (11th Cir. 1996); *West v. FDIC*, 149 Ga. App. 342, 344 (1) (254 SE2d 392) (1979).

closed, the FDIC was appointed as receiver, and the FDIC transferred certain assets to another bank, who made a written demand for full payment of the loan. Id. The debtor claimed that the original loan commitment was supplemented by an oral agreement to further extend the term of the loan. Id. This Court held that the *D'Oench* doctrine protects the assignee bank from claims based on purported agreements not of record. Id.

In another similar case, the Fifth Circuit addressed a debtor's contention that the predecessor bank had a history of certain dealings (in line with prevailing local banking customs) such that the express terms of the note should be understood in light of those customs and practices:

> We acknowledge the logic of the point raised by the Hamiltons and recognize its equitable persuasiveness. . . . Notwithstanding the considerable force of the argument advanced by the Hamiltons, we must conclude that the long arm of *D'Oench, Duhme* reaches out to block their claims. The rationale which bars claims based on oral agreements and collateral writings is equally applicable to claims based on unwritten, albeit widespread and prevailing, banking customs. Equity argues strongly that it should not be so, but the now broad redoubts of the *D'Oench, Duhme* fortress bind our analysis.

*Hamilton*, 939 F2d at 1229. We echo the Fifth Circuit's sentiments while adopting its application of the *D'Oench* doctrine to banking practices or customs.

Because of *D'Oench's* broad protection, "[i]t is not relevant that the borrower did not intend to deceive banking authorities or that the underlying transaction was not fraudulent." *Hamilton*, 939 F2d at 1228; see also *Holden*, 268 Ga. at 74 (acknowledging potential harsh result where debtor may be innocent of any wrongdoing but nonetheless applying the *D'Oench* doctrine in order to preserve the doctrine's purpose of protecting bank depositors and federal guarantors of banks). Therefore, while there may be genuine issues of fact regarding exactly what Chestatee said or did with regard to modifications of the Loan, those facts are not here material. Accordingly, the trial court did not err in finding that the February 2010 Letter, which was not signed by Chestatee, and the prior dealings or practices of Chestatee fall within the wide reach of the *D'Oench* doctrine and cannot serve to preclude summary judgment in favor of BOZ. See *Langley*, 484 U.S. at 92; *Hamilton*, 939 F2d at 1229.

2. Appellants also argue that the trial court erred in finding that the administrative exhaustion doctrine included within the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 USC § 1821 (d) (13) (D), barred

their counterclaims against BOZ.[4] "FIRREA was enacted to strengthen regulation of the nation's financial system in the wake of the savings and loan crisis of the 1980s, and it grants the FDIC broad powers under 12 USC § 1821 to manage the affairs of insolvent banks as receiver or conservator." (Punctuation omitted.) *Bobick v. Comm. & S. Bank*, 321 Ga. App. 855, 861 (3) (743 SE2d 518) (2013) (quoting *Iberiabank v. Beneva 41-I, LLC*, 701 F3d 916, 921 (11th Cir. 2012)). The Act also created an administrative process for addressing claims against failed banks for which the FDIC has been appointed as receiver. Id. Pursuant to that process, the FDIC is authorized to determine claims against a failed bank under procedures established by the Act. Id. Anticipating that the FDIC would face numerous claims regarding failed lending entities, Congress established limits on judicial review of such claims:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over --
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository

---

[4] In ruling on BOZ's motion to dismiss, the trial court found that, because BOZ relied upon evidence outside of the pleadings, its motion was actually one for summary judgment. See OCGA § 9-11-12 (b). Therefore, we will apply the summary judgment standard of review given the trial court's treatment of the motion.

institution for which the [FDIC] has been appointed receiver, including assets which the [FDIC] may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the [FDIC] as receiver.

12 USC § 1821 (d) (13) (D); see also *Bobick*, 321 Ga. App. at 861 (3).

This Court recently adopted the Eleventh Circuit's reasoning that the limitation of judicial review imposed by 12 USC § 1821 (d) (13) (D) established an administrative exhaustion requirement. *Bobick*, 321 Ga. App. at 861 (3) (citing *Interface Kanner, LLC v. JP Morgan Chase Bank, N.A.,* 704 F3d 927, 934 (11th Cir. 2013)). Moreover, "all claims falling within 12 USC § 1821 (d) (13) (D) are subject to the exhaustion requirement regardless of whether they are asserted as initial claims or as counterclaims." (Citation and punctuation omitted.) Id. at 862-863. Accordingly, if a claim or counterclaim falls within the scope of 12 USC § 1821 (d) (13) (D), courts are divested of subject matter jurisdiction if the claimant failed to exhaust his or her administrative remedies before the FDIC.[5] Id. at 863.

---

[5] Claimants may seek judicial review after an administrative claim has been disallowed or if 180 days expire without a determination by the FDIC. 12 USC § 1821 (d) (6).

Appellants do not allege that they have exhausted the administrative claims process established by FIRREA. Instead, Appellants urge us to adopt the approach taken by the D. C. and Ninth Circuit Courts of Appeals, holding that FIRREA is not a jurisdictional bar for claims brought against the successor bank for its own actions after assuming a failed bank's assets and liabilities from the FDIC.[6] In characterizing their counterclaims as claims based on BOZ's own actions, Appellants argue that BOZ, as the successor bank, breached the agreement between Appellants and Chestatee, an agreement that BOZ "inherited" and by which it was bound. However, even if we agreed with Appellants' characterization of their claims, Appellants are not allowed to use any oral promises or written side agreement as a shield or sword against either the FDIC or BOZ.[7] See, e.g., *Holden*, 268 Ga. at 74; *Hewitt*, 324 Ga. App. at 715.

---

[6] See, e.g., *American Nat. Ins. Co. v. FDIC*, 642 F3d 1137 (D. C. Cir. 2011); *Benson v. JP Morgan Chase Bank*, 673 F3d 1207 (9th Cir. 2012).

[7] We are not persuaded that Appellants' claims are based on any independent actions of BOZ, apart from their refusal to continue a pattern of modifications allowed by Chestatee before its seizure. We also note that Appellants complain that Chestatee itself had begun "reneging" on its promises even before BOZ entered the picture.

Therefore, we must determine whether Appellants' counterclaims for breach of contract, promissory estoppel, unjust enrichment and declaratory relief are included within the claims process established by FIRREA. This Court has adopted

the Eleventh Circuit's construction of 12 USC § 1821 (d) (13) (D) as broadly covering all

(1)     claims for payment from assets of any depository institution for which the FDIC has been appointed Receiver;

(2)     actions for payment from assets of such depository institutions;

(3)     actions seeking a determination of rights with respect to the assets of such depository institutions; and

(4)     claims relating to any act or omission of such institution of the FDIC as receiver.

(Punctuation omitted.) *Bobick*, 321 Ga. App. at 862 (3) (citing *American First Fed. v. Lake Forest Park, Inc.*, 198 F3d 1259, 1263 (11th Cir. 1999)). In addition, "an entity such as [BOZ] that purchases a failed lending institution's assets from the FDIC acquires the administrative review protections afforded by [12 USC § 1821 (d)

14

(13) (D)] and is entitled to seek dismissal of a claim for failure to exhaust administrative remedies." (Punctuation omitted.) Id. at 864 (3).

Here, Appellants assert counterclaims based upon an alleged contractual agreement with Chestatee, an institution for which the FDIC was appointed as receiver, and seek both a declaratory judgment (that they owe nothing further on the Loan due to the formation of a new contractual agreement) and compensation for damages sustained as a result of an alleged breach of contract.[8] These counterclaims are "claims for payment from assets of a deposition institution for which the FDIC has been appointed receiver" and actions "seeking a determination of rights with

---

[8] Appellants also argue that, even if their counterclaims are barred by the administrative exhaustion requirement, their affirmative defenses nonetheless survive. However, their affirmative defenses – which include estoppel and failure to perform a condition precedent – also arise from the purported new agreement reached with Chestatee. We agree with the Eleventh Circuit's reasoning that "a court must look beyond the nomenclature of a request for relief to ascertain whether it is a true affirmative defense or is, in actuality, a claim requiring exhaustion as a prerequisite to jurisdiction." *American First Fed.*, 198 F3d at 1264. Therefore, "[w]hether a request for relief is titled an affirmative defense or a counterclaim is not dispositive to the question of subject matter jurisdiction. The germane question is whether the remedy sought by a party, regardless of its label, is encompassed by [12 USC §] 1821 (d) (13) (D), that is, whether the assertion is in reality a claim against the assets or actions of the failed institution or the [FDIC] as receiver." Id. at 1264-1265. In any event, because we have already determined that Appellants' specific defenses are barred under the *D'Oench* doctrine, whether they are also barred under FIRREA is moot.

15

respect to the assets of a depository institution for which the FDIC was appointed as receiver." (Punctuation omitted.) *Bobick*, 321 Ga. App. at 863. "It follows that [Appellants'] counterclaims brought against [BOZ] come within the ambit of 12 USC § 1821 (d) (13) (D) and are subject to the administrative exhaustion requirement imposed by FIRREA." (Punctuation omitted.) Id. "Hence, because [Appellants] asserted [their] counterclaims after the appointment of the FDIC as receiver and failed to exhaust [their] administrative remedies pertaining to those claims, the jurisdiction of the superior court must yield to federal law, and [Appellants'] counterclaims were properly dismissed." Id. at 866 (3).

*Judgment affirmed. Andrews, P. J., and Dillard, J., concur.*