**RALLS CORPORATION, Plaintiff,**

**v.**

**HUERFANO RIVER WIND, LLC, et al., Defendants.**

Civil Action No. 3:13–cv–213–TCB.

United States District Court, N.D. Georgia, Newnan Division.

Signed June 27, 2014.

Brian Joel Levy, John Phillip Mac-Naughton, Ross A. Albert, Morris Manning & Martin, LLP, Atlanta, GA, for Plaintiff.

Jeffrey A. Leon, Complex Litigation Group, LLC, Highland Park, IL, Andrew Joseph Coomes, McConnell & Sneed, LLC, Atlanta, GA, for Defendants.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

Before the Court are two motions to dismiss: a motion to dismiss for lack of personal jurisdiction brought by Defendants U.S. Innovative Renewable Energy, LLC (USIRE), Xiaolin "Jerry" Zhang and Lu "Lucy" Zhang [29]; and a motion to dismiss for failure to state a claim on each of the nine counts in Plaintiff Ralls Corporation's amended complaint brought by USIRE and the Zhang's [29] and Defendant Huerfano River Wind, LLC (HRW) [30].

## I. Background [1]

In October 2012, Ralls began negotiations with Jerry Zhang and USIRE, a Delaware limited liability company of which Zhang is the sole member, about constructing a wind farm in Huerfano County, Colorado. Ralls and its senior executives knew and had done business with Zhang in the past. Over the next five months, Zhang and his wife Lucy negotiated the terms of the deal. In doing so, they made several trips to Georgia. They also communicated with Ralls's representatives or attorneys in Georgia; specifically, Jerry Zhang placed or participated in at least eight telephone calls, and both Jerry and Lucy Zhang sent a number of emails. The deal closed on March 22, 2013.

As part of this deal, USIRE purchased HRW,[2] a Colorado limited liability company. Ralls and HRW then entered into a series of related transactions memorialized in integrated agreements. This action centers around the alleged breach of two of those agreements.

The first is a loan and security interest agreement in which Ralls loaned HRW just over $13.4 million. This loan was to cover the cost of (1) acquiring the wind farm ($1.1 million), (2) purchasing four wind-turbine generators ($8.8 million), and (3) constructing the wind farm ($3.5 million, with the possibility of upward adjustment). In return, HRW granted Ralls a security interest in the turbines to secure its obligations under the loan documents.

The second is a secured promissory note that HRW executed in favor of Ralls. HRW can derive revenue from two different sources: a power purchase agreement that it entered into with a local electric cooperative, San Isabel Electric Association, Inc., and investment and production tax credits. The repayment terms in the note vary by source.

According to the loan agreement, an event of default occurs if HRW fails to perform any of its obligations under any of the loan documents. If an event of default

---

1. At the motion-to-dismiss stage, the factual allegations in the amended complaint are accepted as true, and all inferences from these allegations are construed in the light most favorable to Ralls. *Belanger v. Salvation Army,* 556 F.3d 1153, 1155 (11th Cir.2009).

2. At that time, HRW was known as New Centennial Power, LLC.

remains uncured, Ralls has the right to accelerate the loan, rendering the entire debt immediately due and payable. And once accelerated, Ralls is entitled to exercise any right or remedy under the loan documents.

For present purposes, the following obligations under the loan documents are relevant.

First, paragraph 5 of the note provides that "the Acquisition Cost shall become immediately due and fully payable" to Ralls on "the date on which the actual amount of the Construction Cost has exceeded [$2,419,169]"—the trigger amount.

Second, section 1.7 of the loan agreement provides that "the date that the actual amount of the Construction Cost has exceeded [$2,419,169]"—the trigger amount—"such excess amount, as incurred, shall be immediately due and payable to [Ralls] by [HRW]."

Third, section 1.4 of the loan agreement provides for the opening of a "mutually designated" account into which any proceeds from the sale of electricity to San Isabel are to be deposited. The sole purpose of this account, according to that section, is to facilitate the calculation of the net cash flow (defined in paragraph 4 of the note) and the repayment of the loan under the terms of the note.

Section 1.4 also provides that
(x) any single payment in the amount in excess of $5,000 or (y) any payment that shall make the total payments in a calendar month to exceed $10,000, in either case to be made out of such mutually designated account to any third party, shall be made only upon the written approval of [Ralls].

Finally, paragraph 2 of the note provides that the loan is to be repaid quarterly from the revenue generated from the sale of electricity to San Isabel. Specifically, the quarterly payments must be ninety-five percent of the "Net Cash Flow," which is defined in paragraph 4 of the note as

the payments received by [HRW] from any of its customers, including any utility company, in consideration for the electricity purchased from [HRW] minus (x) any amount paid by [HRW] for the maintenance services on the turbines and other equipment of [HRW] minus (y) any other statutory or mandatory payment made by [HRW], including tax payments. . . .

Ralls alleges that HRW has breached several of its obligations under the loan documents and thus is in default and liable for the entire balance of the loan.

First, in a letter dated August 26, 2013, Ralls notified HRW that the actual construction costs had exceeded the trigger amount and demanded payment of the full amount of the acquisition cost under paragraph 5 of the note. HRW has not made this payment.

Second, in a letter dated February 14, 2014, Ralls notified HRW that the actual construction costs had exceeded the trigger amount—enclosing a letter from the wind farm's contractor confirming that Ralls had incurred and paid $2,875,833 in construction costs. Under section 1.7 of the loan agreement, Ralls demanded that HRW make an immediate payment of $456,664, the amount by which the actual construction costs exceed the trigger amount. HRW has yet to make this payment.

Third, Ralls alleges that "HRW has refused to open and administer an account mutually designated by Ralls and HRW." Ralls notified HRW that this violated section 1.4 of the loan agreement in a letter dated November 26, 2013.

Last, Ralls avers that HRW has used the San Isabel revenue for purposes other than repaying the loan. To support this allegation, Ralls relies on HRW's 2013 profit-and-loss statement (received in late January 2014). In Ralls's view, the profit-and-loss statement "reflects several hundred thousands of dollars of purported expenses that were neither permissible under the definition of 'Net Cash Flow' set forth in the Note, nor were they incurred and paid in compliance with Section 1.4 of the Loan Agreement."

Ralls alleges that the following expenses listed in the profit-and-loss statement, among others, cannot be deducted when determining the net cash flow:

(1) $125,000 for payroll. HRW entered into an undated executive employment agreement with Lucy Zhang under which she receives a monthly base salary of $12,500 effective March 2013;

(2) $155,000 for professional fees (other). Based on an invoice from USIRE seeking an asset management fee equal to three percent of the appraised value of HRW ($15.5 million) prorated for the September to December 2013 period; and

(3) $139,430 for legal fees.

Ralls also alleges that the profit-and-loss statement shows that HRW has entered into agreements that impair its ability to meet its obligations as they come due and thus has failed to keep its representation to avoid incurring such obligations and to possess sufficient capital to operate. Finally, Ralls alleges that the profit-and-loss statement demonstrates Jerry Zhang's self-dealing and shows that he has not respected the corporate form of HRW and USIRE.

Accordingly, Ralls brings the following causes of action against Defendants:

Count one: breach of contract against HRW;

Count two: breach of the implied duty of good faith and fair dealing against HRW;

Count three: conversion against all Defendants;

Count four: alter-ego liability against USIRE and Jerry Zhang;

Count five: unjust enrichment against Lucy Zhang;

Count six: request for prejudgment attachment against all Defendants;

Count seven: equitable accounting against all Defendants;

Count eight: fraudulent transfers against USIRE and Lucy Zhang; and

Count nine: civil conspiracy against Jerry and Lucy Zhang.

In addition to these causes of action, Ralls seeks attorney's fees in connection with its breach-of-contract claim and punitive damages in connection with its claims for conversion and civil conspiracy.

Defendants have moved to dismiss for failure to state a claim each count in Ralls's amended complaint along with Ralls's claims for punitive damages and attorney's fees. Additionally, USIRE and the Zhangs have moved to dismiss for lack of personal jurisdiction.

The Court will first consider USIRE and the Zhangs' jurisdictional challenge. *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 940 (11th Cir.1997) ("As a general rule, courts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claims.").

## II. Personal Jurisdiction over USIRE and the Zhangs

The adjudicatory authority of a federal court is often coextensive with that of the forum state. *See Daimler AG v. Bauman,*

—— U.S. ——, 134 S.Ct. 746, 753, 187 L.Ed.2d 624 (2014). This is because in most federal cases personal jurisdiction is "linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.' " *Walden v. Fiore*, —— U.S. ——, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014) (quoting FED. R.CIV.P. 4(k)(1)(A)). In this respect, this case is typical.[3] Thus, the Court's adjudicatory authority over USIRE and the Zhangs is coextensive with that of a Georgia Superior Court.

The Due Process Clause of the Fourteenth Amendment protects a nonresident's "liberty interest" in not being bound to a judgment in Georgia without first establishing meaningful "contacts, ties, or relations" with the state. *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 811 (11th Cir. 2010) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)) (internal quotation marks omitted). The hallmark of this protection is "fair warning." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir.2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). That is, Georgia courts cannot exercise personal jurisdiction over a nonresident unless "the defendant's conduct and connection with [Georgia] are such that he should reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474, 105 S.Ct. 2174 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). And while Georgia's

adjudicatory authority is no longer tied to a nonresident's physical presence within its territorial border, personal jurisdiction still generally depends on whether a nonresident has established "certain minimum contacts ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Walden*, 134 S.Ct. at 1121 (quoting *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940))) (internal quotation marks omitted).

There are two kinds of personal jurisdiction: general and specific. *Daimler AG*, 134 S.Ct. at 754. General jurisdiction exists when the nonresident's "affiliations with the State are so 'continuous and systematic' as to render [the nonresident] essentially at home in the forum State," thereby permitting a judgment on any claim. *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, —— U.S. ——, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011)) (internal quotation mark omitted). Specific jurisdiction, on the other hand, "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Id.* (alterations in original) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). This case involves only specific jurisdiction.

### A. Motions to Dismiss for Lack of Personal Jurisdiction

A plaintiff in federal court must allege sufficient facts in the complaint to make out a prima facie case of personal jurisdiction over a nonresident defendant. *Diamond Crystal*, 593 F.3d at 1257.

---

**3.** Rule 4(k)(1) grants federal courts sitting in diversity adjudicatory jurisdiction over a defendant who has been served a summons (or waived service) in two other instances. Neither applies here. USIRE and the Zhangs

were not joined under Federal Rule of Civil Procedure 14 or 19, nor were they served under a federal statute. FED.R.CIV.P. 4(k)(1)(B)-(C).

When, as here, no evidentiary hearing is held on a motion to dismiss for lack of personal jurisdiction, a prima facie case exists where the plaintiff presents enough evidence to survive a motion for judgment as a matter of law. *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir.2000). And unless the nonresident defendant introduces evidence that contradicts the plaintiff's jurisdictional allegations, all allegations in the complaint are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor. *Id.* Here, USIRE and the Zhangs have not introduced any contradictory jurisdictional evidence, so the sole source of jurisdictional facts is Ralls's amended complaint.

■ For federal courts sitting in diversity, the specific-jurisdiction inquiry is a two-step process. First, they ask whether exercising jurisdiction is appropriate under the forum state's long-arm statute; and if so, they consider whether exercising jurisdiction would violate due process. *Diamond Crystal*, 593 F.3d at 1257–58. Because Georgia has not extended the state's long-arm statute to the limits of due process, each step of the inquiry is distinct. *See id.* at 1259 (construing *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames*, 279 Ga. 672, 620 S.E.2d 352 (2005)).

### 1. Step One: Georgia's Long–Arm Statute

Georgia's long-arm statute reaches only those nonresidents whose conduct brings them within the ambit of at least one of the statute's six subsections. O.C.G.A. § 9–10–91. And each subsection is construed literally. *Innovative Clinical*, 620 S.E.2d at 353. Like most states, Georgia permits its courts to exercise personal ju-

risdiction over nonresidents who "[t]ransact any business within the State" so long as the cause of action "arises out of" these transactions. § 9–10–91(1); 4A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1069.3 (3d ed.2002). Here, Ralls's allegations implicate only this subsection.[4]

■ The Georgia Supreme Court recently reiterated that the long-arm statute "grants Georgia courts the unlimited authority to exercise personal jurisdiction over any nonresident who transacts any business in [Georgia]." *Amerireach.com, LLC v. Walker*, 290 Ga. 261, 719 S.E.2d 489, 494 (2011) (quoting *Innovative Clinical*, 620 S.E.2d at 355). Importantly, transacting business does not require physical presence in Georgia. *Diamond Crystal*, 593 F.3d at 1264 (citing *Innovative Clinical*). Courts thus consider both a nonresident's tangible and intangible conduct, such as "mail, telephone calls, and other 'intangible' acts"—even if they occurred outside of Georgia—to determine "whether it can fairly be said that the nonresident has transacted any business within Georgia." *Id.; see also id.* at 1264 n. 18 (finding "instructive the literal definition of the words in the statute" and providing the definitions of *transact, any* and *business* from WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993)); *Lima Delta Co. v. Global Aerospace, Inc.*, 325 Ga.App. 76, 752 S.E.2d 135, 139–40 (2013) (noting that post-*Innovative Clinical* long-arm jurisdiction may be "based on business conducted by the defendant or its agent 'through postal, telephonic, and Internet contacts'" (quoting *ATCO Sign & Lighting Co. v. Stamm Mfg. Inc.*, 298 Ga.App. 528, 680 S.E.2d 571, 576 (2009))).

---

**4.** Ralls's amended complaint does not specify which subsection of the long-arm statute authorizes personal jurisdiction over USIRE and the Zhangs, but this is the only subsection referred to in its opposition brief.

In its amended complaint, Ralls alleges that Jerry Zhang (as a representative of USIRE) and Lucy Zhang made several trips to Georgia to negotiate the terms of the wind-farm deal. USIRE and the Zhangs contend that these allegations do not establish a prima facie case under the Georgia long-arm statute. At bottom, their argument rests on the so-called *fiduciary-shield doctrine*: "that [they] cannot be subject to personal jurisdiction in Georgia courts based solely upon acts taken in [their] capacity as a corporate officer." *Amerireach.com*, 719 S.E.2d at 493. Their argument fails.

 In *Amerireach.com*, the Georgia Supreme Court explained that nothing in the long-arm statute indicates that the General Assembly intended to shield agents or fiduciaries acting on a corporation's behalf from the adjudicatory authority of the state's courts. *Id.* The court then held that the fiduciary-shield doctrine is inconsistent with Georgia law. *Id.* at 493–96.[5] USIRE and the Zhangs thus find no protection behind this doctrine. And just as importantly, one well-recognized way for nonresidents to transact business under Georgia law is to negotiate the terms of an agreement within the state. *E.g., Genesis Research Inst., Inc. v. Roxbury Press, Inc.*, 247 Ga.App. 744, 542 S.E.2d 637, 639 (2000). Thus, by alleging that part of the wind-farm negotiations occurred in Georgia, Ralls's amended complaint sufficiently alleges that USIRE and the Zhangs' conduct constitutes transacting business under the long-arm statute.

\* \* \*

That USIRE and the Zhangs transacted business within Georgia does not end the long-arm inquiry. After all, that "statute permits jurisdiction where a plaintiff's cause of action *'arises out of'* a nonresident defendant's 'transact[ion] of any business within [Georgia].'" *Diamond Crystal*, 593 F.3d at 1264 (alterations in original) (emphasis added) (quoting O.C.G.A. § 9–10–91(1)). In other words, this statute "requires that the cause of action arise from the act of transacting business in Georgia." *Smith v. Air Ambulance Network, Inc.*, 207 Ga.App. 75, 427 S.E.2d 305, 306 (1993). The long-arm inquiry thus poses a second question: does at least one of Ralls's causes of action against USIRE and the Zhangs arise out of the business that they transacted in Georgia?

How to answer this question under Georgia law rather than the Fourteenth Amendment is not obvious, however. This is because "Georgia's appellate courts have developed[, and the Georgia Supreme Court seems to support,] a three-part test to determine whether a defendant has transacted business in Georgia so as to subject itself to the personal jurisdiction of the State's courts." *Lima Delta*, 752 S.E.2d at 139. Under this test,

> Jurisdiction exists on the basis of transacting business in this [S]tate (1) if the nonresident defendant has purposefully done some act or consummated some transaction in this [S]tate, (2) if the cause of action arises from or is connected with such act or transaction, and (3) if the exercise of jurisdiction by the courts of this [S]tate does not offend traditional notions of fairness and substantial justice.

*Id.* (alterations in original) (quoting *Aero Toy Store, LLC v. Grieves*, 279 Ga.App. 515, 631 S.E.2d 734, 737 (2006)); *see also*

---

5. In reaching this conclusion, the Georgia Supreme Court expressly overruled two Georgia Court of Appeals decisions and declined to follow a handful of federal district court cases—most of which USIRE and the Zhangs cite in their opening brief—that held that the fiduciary-shield doctrine was consistent with Georgia law.

*Amerireach.com,* 719 S.E.2d at 496 (quoting *Aero Toy Store* ).

According to these courts, parts one and two ensure that a nonresident has sufficient minimum contacts with Georgia to permit the exercise of personal jurisdiction. *Lima Delta,* 752 S.E.2d at 139; *see also Amerireach.com,* 719 S.E.2d at 496 (holding that the plaintiff's allegations regarding the in-state activities of nonresident fiduciaries of a limited liability company satisfied the minimum-contacts test because "[t]hese allegations support a finding that the individual defendants were primary participants in [the company's] transaction of business within this state [and] that the cause of action arises from or is connected with such act or transaction" (quoting *Aero Toy Store,* 631 S.E.2d at 737) (all internal punctuation omitted)). And part three ensures that exercising personal jurisdiction is reasonable. *Lima Delta,* 752 S.E.2d at 139.

Simply put, Georgia's courts have incorporated the due-process inquiry into the three-part test for determining whether personal jurisdiction lies under subsection (1) of the long-arm statute. To illustrate, consider part one, which requires the nonresident defendant to have *"purposefully* done some act or consummated some transaction" in Georgia. *Id.* (emphasis added). Purposeful conduct, however, is not necessary under the literal construction of subsection (1). On the contrary, this provision "grants Georgia courts the *unlimited authority* to exercise personal jurisdiction over any nonresident who *transacts any business* in this State." *Innovative Clinical,* 620 S.E.2d at 355 (emphasis added).

■ Of course, as the Georgia Supreme Court recognized, exercising personal jurisdiction whenever this requirement was met would extend Georgia's adjudicatory authority beyond the bounds set by the Fourteenth Amendment. To avoid this result, the supreme court held that "subsection (1) ... reach[es] only 'to the maximum extent permitted by procedural due process.'" *Id.* (quoting *Coe & Payne Co. v. Wood–Mosaic Corp.,* 230 Ga. 58, 195 S.E.2d 399, 401 (1973)). This explains the "purposeful conduct" requirement—a staple of the due-process inquiry—in part one of Georgia's personal-jurisdiction test. *Cf. Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) ("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."). Consequently, Georgia courts can exercise personal jurisdiction under the transacting-business provision only if the nonresident's conduct was directed at or occurred in Georgia. *See Diamond Crystal,* 593 F.3d at 1264.

■ Another well-established aspect of the due-process inquiry in specific-jurisdiction cases is "whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum." *Louis Vuitton Malletier, S.A. v. Mosseri,* 736 F.3d 1339, 1355 (11th Cir.2013) (citing *Helicopteros,* 466 U.S. at 413–14, 104 S.Ct. 1868). Substantively, however, this due-process question is the same as part two of the personal-jurisdiction test under the transacting-business provision. It is not surprising then that few, if any, Georgia cases separate the arises-out-of inquiry under the long-arm statute from the arises-out-of-or-related-to inquiry under the Due Process Clause. For this reason, that USIRE and the Zhangs' conduct falls within the literal meaning of the transacting-business provision functionally ends

the long-arm inquiry,[6] and the arises-out-of question will be answered in step two of the specific-jurisdiction inquiry: would exercising personal jurisdiction violate USIRE and the Zhangs' constitutional rights?

### B. Step Two: Due Process

 The due-process step of the specific-jurisdiction inquiry centers on "the relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). Because the constitutional "limits on [Georgia's] adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties"—the connection to Georgia "must arise out of contacts that the 'defendant himself' creates." *Walden*, 134 S.Ct. at 1122 (quoting *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174). So before Georgia courts can exercise personal jurisdiction, a nonresident's "*suit-related* conduct must create a *substantial connection*" with the state. *Id.* at 1121 (emphasis added). For this reason, this analysis focuses on "the defendant's contacts with [Georgia] itself, not the defendant's contacts with persons who reside there." *Id.* at 1122. And while the parties' relationships to one another may be relevant in evaluating their forum contacts, USIRE and the Zhangs' contacts must be analyzed individually. *Rush v. Savchuk*, 444 U.S. 320, 332, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980).

 In short, the due-process inquiry in specific-jurisdiction cases has three prongs:

(1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."

*Louis Vuitton Malletier*, 736 F.3d at 1355 (citing *Burger King*, 471 U.S. at 472–73, 474–75, 105 S.Ct. 2174; *Helicopteros*, 466 U.S. at 413–14, 104 S.Ct. 1868; *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154; as well as *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220–21 (11th Cir.2009); *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 630–31 (11th Cir.1996)).

For the first two prongs, the burden of proof lies with the plaintiff. Should he carry this burden, the defendant must come forward with compelling evidence that establishes the third prong. *Id.; see also Diamond Crystal*, 593 F.3d at 1267.

### 1. Prong One: The Relatedness of Ralls's Claims to USIRE and the Zhangs' Georgia Contacts

Neither the Supreme Court nor the Eleventh Circuit has established a specific approach for district courts to follow when deciding whether a nonresident defendant's contacts are sufficiently related to the plaintiff's claims. *Oldfield*, 558 F.3d at 1222. Even so, this much is clear: the

---

**6.** As the Eleventh Circuit has explained, "[t]he significance of the three-prong approach is that, under Georgia law, there must be a long-arm assessment that is separate and apart from the due process analysis." *Diamond Crystal*, 593 F.3d at 1260 n. 11. Indeed,

"the sole touchstone of long-arm jurisdiction" under subsection (1) of Georgia's long-arm statute is "analyzing whether the nonresident defendant '[t]ransacts any business within this state.'" *Id.* at 1263 n. 15 (alteration in original).

"inquiry must focus on the direct causal relationship between 'the defendant, the forum, and the litigation.'" *Fraser v. Smith,* 594 F.3d 842, 850 (11th Cir.2010) (quoting *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868). And for claims sounding in tort, the circuit has held that the nonresident's forum contacts must be not only a "but for" cause of the tort but also sufficient to provide "fair warning" that he could be haled into court there. *See Oldfield,* 558 F.3d at 1222–23.

Here, Ralls alleges that USIRE and the Zhangs have numerous Georgia contacts, including attending several in-state meetings as well as participating in a number of telephone calls with and sending emails to Ralls's representative or attorneys in Georgia. Each contact, according to the amended complaint, concerned the wind farm, and these contacts occurred both before and after the loan documents were executed.

USIRE and the Zhangs dispute whether Ralls sufficiently alleges that they have the requisite "substantial connections" with Georgia to satisfy due process. This point is put most succinctly in their reply brief: "Ralls' allegation of contacts are all prior to the execution of the relevant agree-ments, but its [amended] complaint alleges conduct that occurred *after* execution, none of which is alleged to have resulted from contacts with Georgia." And later in the brief, they conclude, "[Ralls's] claims here arise out of and relate to the post-formation performance, or alleged non-performance, of the underlying contract, none of which took place or will take place in Georgia." [7]

In its opposition brief, Ralls highlights USIRE and the Zhangs' connections to Georgia. Then—without argument—it asserts that the "causes of action against the USIRE and the Zhangs arise from those negotiations." Later in its brief, Ralls concludes that "[b]ecause the Nonresident Defendants 'personally involved' themselves in the transactions giving rise to [its] claims, they have established sufficient minimum contacts in Georgia to support personal jurisdiction." [8]

■ While the relatedness question is closer than Ralls's brief suggests, a fair reading of the amended complaint reveals that Ralls has adequately pleaded a prima facie case of personal jurisdiction. Along with allegations of Georgia contacts before the execution of the loan documents, Ralls

7. In their view, "[a]ll of the wind farm activities take place in Colorado, and the performance or nonperformance of the contracts [sic] terms all takes place either within Colorado or North Carolina." Even if this contention is correct, this does not mean that Ralls's claims do not arise out of or relate to USIRE and the Zhangs' Georgia contacts.

8. Ralls also notes that the loan agreement provides that Georgia law applies and dictates that venue lies only with courts sitting in Atlanta, Georgia. While acknowledging that contractual choice-of-law and venue provisions do not necessarily establish personal jurisdiction, Ralls concludes that "when combined with the Nonresident Defendants' other contacts with Georgia, personal jurisdiction is clearly appropriate here."

Contrary to Ralls's contention, it is unclear that the choice-of-law and venue provisions further its case for personal jurisdiction over USIRE and the Zhangs. The loan agreement is between Ralls and HRW. This, of course, does not necessarily render these provisions irrelevant, but it does mean that whatever relevance they have follows from the imputation of HRW's contacts—which indisputably support specific jurisdiction here—to USIRE and the Zhangs via jurisdictional veil-piercing. But even if jurisdictional veil-piercing were appropriate, it is not clear that this contact could be imputed to Lucy Zhang. This is because Ralls does not allege that she was an agent of HRW when the loan documents were executed. In any event, absent jurisdictional veil-piercing, these provisions have no bearing on the due-process inquiry.

alleges that USIRE and the Zhangs had the following in-forum contacts between the March 2013 closing and Ralls's August 26 demand letter:

- Jerry Zhang sent an email stating that USIRE, not HRW, owned the wind farm;
- in May, Ralls and HRW *entered into a balance-of-plant contract in Atlanta, Georgia* that was executed by Jerry Zhang (on behalf of HRW), and Lucy Zhang accompanied him and *participated in meetings in Atlanta* before the contract was executed;
- later that month, Lucy Zhang requested copies of the loan agreement and note from "Ralls' attorneys in this District";
- in July, Jerry and Lucy Zhang *attended a meeting in Atlanta* to discuss the wind farm; and
- in August, Jerry Zhang participated in a conference call discussing the wind farm with Ralls's representatives and attorneys who were in Atlanta.

USIRE and the Zhangs ignore these allegations, most likely because they are unrelated to the loan agreement and note. But whatever their reason, these contacts cannot be ignored. For while unrelated to the agreements at issue, these postclosing contacts show that USIRE and the Zhangs were not only personally involved in HRW's management of the wind farm but also knew that the wind farm's operation

affected a Georgia resident: Ralls. Both facts are constitutionally significant because Ralls's claims against USIRE and the Zhangs follow from the business decisions of HRW—decisions that could have only been made by HRW's president (Lucy Zhang) or its sole member (USIRE through Jerry Zhang).[9]

Additionally, the loan documents are but-for causes of Ralls's legal claims—some of which sound in tort.[10] And in view of USIRE and the Zhangs' role in the management of HRW and their postclosing Georgia contacts related to the wind farm's operation, they should have reasonably foreseen being haled into a Georgia court on claims related to their alleged mismanagement of HRW.

**2. Prong Two: Purposeful Availment**

 ▉ The "purposeful availment" requirement focuses on the nonresident's conduct, thereby ensuring that he "will not be subject to jurisdiction based solely on ' "random," "fortuitous," or "attenuated" contacts.' " *Diamond Crystal,* 593 F.3d at 1268 (quoting *Burger King,* 471 U.S. at 480, 105 S.Ct. 2174). The Eleventh Circuit has made clear that the minimum-contacts analysis is "immune to solution by checklist." *Sloss Indus. Corp. v. Eurisol,* 488 F.3d 922, 925 (11th Cir.2007) (quoting *Prod. Promotions, Inc. v. Cousteau,* 495 F.2d 483, 499 (5th Cir.1974)). At the same time, the circuit has explained that "[c]onsiderations such as the quality, nature, and extent of the activity in the forum, the foreseeability of consequences within the

---

**9.** For example, Ralls's claims essentially derive from HRW's decisions to

(1) enter into an employment agreement with Lucy Zhang;

(2) enter into an asset-management agreement with USIRE;

(3) enter into other business relationships and thus incur costs in violation of the loan documents;

(4) not open a "mutually designated" bank account;

(5) not remit payment of the acquisition loan in accordance with the loan documents or following Ralls's demand for payment; and

(6) deny Ralls the payments it is rightfully due under the note.

**10.** That is, Ralls's claims for conversion, fraudulent transfers and civil conspiracy.

forum from activities outside it ... relate to whether it can be said that the defendant's actions constitute 'purposeful availment.'" *Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 993 (11th Cir.1986) (quoting *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1268 (5th Cir. Unit A Aug.1981)) (internal quotation marks omitted).

█ Here, USIRE and the Zhangs have purposefully engaged in and directed their actions at Georgia and Ralls, a Georgia resident. Specifically, they negotiated the terms of the loan documents and other contracts related to the operation of the wind farm in Georgia. In the process, they invoked "benefits and protections" of Georgia law; thus, "it is presumptively not unreasonable to require [them] to submit to the burdens of litigation" in Georgia. *Burger King*, 471 U.S. at 475–76, 105 S.Ct. 2174.

### 3. Prong Three: Fair Play and Substantial Justice

█ To decide whether exercising personal jurisdiction would violate "fair play and substantial justice" requires consideration of several factors: "(1) 'the burden on the defendant'; (2) 'the forum's interest in adjudicating the dispute'; (3) 'the plaintiff's interest in obtaining convenient and effective relief'; and (4) 'the judicial system's interest in resolving the dispute.'" *Louis Vuitton*, 736 F.3d at 1358 (quoting *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir.2008)). And the burden of coming forward with compelling evidence that this prong is satisfied falls on USIRE and the Zhangs. *Id.* at 1355; *see also Diamond Crystal*, 593 F.3d at 1267.

█ While USIRE and the Zhangs state that exercising personal jurisdiction would violate traditional notions of fair play and substantial justice, this statement is unsupported by the record. Even if

their contacts with Georgia were constitutionally insufficient—which they are not—USIRE and the Zhangs would remain intimately connected to Ralls's claims against HRW. After all, Lucy Zhang is HRW's sole employee; USIRE is HRW's sole member; and Jerry Zhang is USIRE's sole member. Because legal entities can only act through their agents, Ralls allegations of wrongdoing by HRW were carried out by USIRE and the Zhangs—whether collectively or individually. Their role in this litigation is thus assured. Lastly, USIRE and the Zhangs offer no evidence suggesting that litigating this case in Georgia will be burdensome—whether financially or otherwise.

For these reasons, USIRE and the Zhangs have failed to carry their burden of showing that exercising personal jurisdiction over them would violate traditional notions of fair play and substantial justice. And because each movant has individually established constitutionally sufficient contacts with Georgia, the assertion of adjudicative authority over them does not violate due process. Their motion will thus be denied.

### III. Motion to Dismiss for Failure to State a Claim

#### A. Legal Standard

A claim will be dismissed under Federal Rule of Civil Procedure 12(b)(6) if the plaintiff does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012). The Supreme Court has explained this standard as follows:

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citation omitted); *Resnick v. AvMed, Inc.,* 693 F.3d 1317, 1325 (11th Cir.2012). Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level," and "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. And while all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas,* 643 F.3d 1300, 1302 (11th Cir.2011), the court need not accept as true plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Thus, evaluation of a motion to dismiss requires two steps: (1) eliminate any allegations in the complaint that are merely legal conclusions, and (2) where there are well-pleaded factual allegations, "assume their veracity and ... determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679, 129 S.Ct. 1937.

## B. Analysis

HRW, USIRE and the Zhangs move to dismiss for failure to state a claim each of the nine counts in the amended complaint.

### 1. Count One: Breach of Contract by HRW

HRW challenges whether Ralls has adequately pleaded a breach of contract. Specifically, HRW contends that the amended complaint is inadequate in three ways:

*First,* it does not establish that HRW's failure to repay the entire acquisition loan upon Ralls's demand constitutes a breach;

*Second,* it does not establish that HRW has refused to open and administer a mutually designated bank account; and

*Third,* it does not establish that HRW has violated its obligation under the note to remit to Ralls ninety-five percent of the net cash flow on a quarterly basis.

The starting point for many of HRW's arguments is the language of the loan agreement and note.

These documents, along with several letters exchanged between the parties, are attached as exhibits to HRW's motion to dismiss, though they were not attached to Ralls's amended complaint. Normally, district courts must convert a motion to dismiss to one for summary judgment before considering documents outside of the pleadings. *Chesnut v. Ethan Allen Retail, Inc.,* 971 F.Supp.2d 1223, 1228 (N.D.Ga. 2013). But conversion is not required where an extrinsic document is central to the plaintiff's claims and its authenticity is undisputed. *Id.; see also Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir.2005) ("Our prior decisions ... make clear that a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, we may consider such a document provided it meets the centrality requirement imposed in *Horsley* [*v. Feldt,* 304 F.3d 1125, 1134 (11th Cir. 2002) ].").` Ralls has not disputed either the centrality or authenticity of these documents; indeed, most of HRW's exhibits are explicitly referenced in the amended complaint. Thus, these documents will be considered without converting HRW's motion to a motion for summary judgment.

One more prefatory point. Like HRW, Ralls bases many of its arguments on a particular interpretation of the loan agreement and note. Some issues between the parties, therefore, cannot be resolved without construing these loan documents. Neither party argues that contract construction is inappropriate at the motion-to-dismiss stage. Nor is it—at least where (1) the contract has been incorporated into the pleadings (including by reference), and (2) the sufficiency of the pleading depends on the contract's meaning.

■■■■ After all, under Georgia law [11] "[c]ontract construction is a question of law for the court, unless, after applying the rules of contract interpretation, an uncertainty still remains as to which of two or more possible meanings represents the parties' true intentions." *Eells v. State Farm Mut. Auto. Ins. Co.,* 324 Ga.App. 901, 752 S.E.2d 70, 74 (2013) (citing *Davis v. United Am. Life Ins. Co.,* 215 Ga. 521, 111 S.E.2d 488, 491–92 (1959)). "The cardinal rule of construction is to ascertain the intention of the parties." O.C.G.A. § 13–2–3. And so long as the parties' intention is clear, violates no law, and is sufficiently spelled out, "it shall be enforced irrespective of all technical or arbitrary rules of construction." *Id.* And where a contract's terms are plain and unambiguous, "the contractual terms alone determine the parties' intent." *Garrett v. S. Health Corp. of Ellijay, Inc.,* 320 Ga. App. 176, 739 S.E.2d 661, 667 (2013).

This means that the answers to many contract-construction questions will be the same regardless of whether they are answered at the motion-to-dismiss or summary-judgment stage. Even so, the Court is mindful that the purpose of a motion to dismiss is to test the sufficiency of the amended complaint rather than the need

for a jury to resolve disputed issues of fact. Thus, the Court focuses on those provisions of the loan documents that bear directly on the adequacy of Ralls's amended complaint. In the end, some claims in the amended complaint may fail not because of what they lack but rather because of what they—and the documents incorporated by reference—contain. *See Griffin Indus., Inc. v. Irvin,* 496 F.3d 1189, 1205 (11th Cir.2007) ("[The] complaint contains an abundance of factual detail; the complaint itself is 41 pages long, and it was accompanied by 21 different exhibits. Under the Federal Rules of Civil Procedure, these exhibits are part of the pleading 'for all purposes.'" (quoting Fed.R.Civ.P. 10(c))); *Gen. Guar. Ins. Co. v. Parkerson,* 369 F.2d 821, 825 (5th Cir.1966) ("This complaint is plagued not by what it lacks, but by what it contains. All of the paths to relief which the pleading suggests are blocked by the allegations and the attached documents themselves, without more.").

### a. Did Ralls Adequately Allege That It Funded the Acquisition Loan?

HRW contends that Ralls never alleges that it made the acquisition loan. "There is no pleading at all as to whether the loan was made, the date, the format (check or wire transfer), amount or anything else." In HRW's view, "the pleading of the provision of the subject funds should be among the most basic pleading obligations of a lender alleging a breach."

Setting aside whether the Federal Rules *should* require Ralls to specifically plead that it made the acquisition loan to state a breach-of-contract claim for failure to repay that loan, Ralls has pleaded—albeit generally—that it funded the acquisition loan. Greater specificity is not required.

---

**11.** The parties agreed that Georgia law would govern via a choice-of-law clause in section 9.12 of the loan agreement and paragraph 10 of the note.

*See* FED.R.CIV.P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."); FED.R.CIV.P. 9(c) (providing that conditions precedent may be pleaded generally); *see also infra* note 13. Additionally, section 1.8 of the loan agreement provides: "[HRW] hereby acknowledges and agrees that as of the date hereof, [Ralls] has advanced to [HRW], and [HRW] has received from [Ralls], in cash, the total amount of the Acquisition Cost." This unambiguous provision—which Ralls quotes in its opposition brief but which HRW fails to even mention in its reply brief—appears to also foreclose HRW's argument.

**b. What Is HRW's Payment Obligation Once the Actual Construction Costs Exceed the Trigger Amount?**

 The parties agree that HRW's obligation to repay the acquisition loan is triggered when "the actual amount of the Construction Cost has exceeded [$2,419,-169]." What they disagree about is the scope of HRW's obligation once the repayment trigger is pulled.

The following facts are relevant:

On August 26, 2013, Ralls notified HRW in writing that HRW was in default under the note. Under paragraph 5 of the note, the entire amount of the acquisition loan became due and payable to Ralls when the actual construction costs exceeded the trigger amount, which this letter stated had occurred. HRW failed to make this payment.

On February 14, 2014, Ralls sent HRW a letter that included as an attachment a letter from the contractor for the wind farm, which indicated that Ralls had incurred and paid $2,875,833 in construction costs. Under section 1.7 of the loan agreement, Ralls demanded immediate payment of the excess amount ($456,-664). HRW did not remit payment.

In its opposition brief, Ralls contends that it has alleged two separate breaches by HRW: one under the note (tied to HRW's nonpayment of the entire acquisition loan following the August 26 letter) and one under the loan agreement (tied to HRW's nonpayment of the excess amount following the February 14 letter).

In its reply brief, HRW argues—not for the first time—that performance under both loan documents is impossible. This is so, the argument goes, because the note makes the full amount of the acquisition loan due once the trigger amount is reached, but the loan agreement mandates only that the excess amount becomes due—and then only on an as-incurred basis. As a result, HRW could pay the excess amount due under the loan agreement and still be in breach under the note so long as the excess amount is less than the acquisition loan. HRW thus argues that Ralls's interpretation renders section 1.7 of the loan agreement illusory and activates the supremacy clause of section 9.11 of the loan agreement, which provides that "if there is a conflict between this Agreement and any other document executed contemporaneously herewith [e.g., the note] with respect to the Obligations, the provision of this Agreement shall control."

HRW has the better argument. To begin, the loan agreement and note must be construed together. After all, Ralls alleges that during the March 2013 closing "Ralls and HRW . . . entered into a series of related transactions memorialized in integrated agreements." [18] at ¶ 23. This allegation is buttressed by the integration and merger clauses in section 9.11 of the loan agreement: "This Agreement and the other written agreements between [HRW] and [Ralls] represent the entire agreement between the parties concerning the subject

matter hereof, and all oral discussions and prior agreements are merged herein." Finally, construing the loan documents—which were executed during the March 2013 closing—together is consistent with longstanding Georgia law. *See Hardin v. Great N. Nekoosa Corp.*, 237 Ga. 594, 229 S.E.2d 371, 374 (1976) ("Where instruments are executed at the same time in the course of the same transaction, they should be read and construed together." (citing *Dyal v. Foy & Shemwell, Inc.*, 159 Ga. 848, 126 S.E. 783, 785–86 (1925))); *see also Rizk v. Jones*, 243 Ga. 545, 255 S.E.2d 19, 20 (1979); *Curry v. Georgia*, 309 Ga. App. 338, 711 S.E.2d 314, 317 (2011).

The note and the loan agreement impose conflicting obligations regarding the repayment of the acquisition loan. For this reason, the loan agreement's supremacy clause—which Ralls does not even mention—voids HRW's obligation under paragraph 5 of the note. This means that HRW cannot be in breach for failing to remit the entire sum of the acquisition loan following the August 26 demand letter. Ralls's breach-of-contract claim related to HRW's nonpayment of the entire acquisition loan thus fails.

Importantly, this does not mean that HRW's repayment obligations were not triggered when the actual construction costs exceeded the trigger amount—which Ralls's August 26 letter states had occurred.[12] Nor does it mean that Ralls has failed to state a breach-of-contract claim under section 1.7 of the loan agreement for HRW's failure to pay the excess amount demanded in Ralls's February 14 letter. Indeed, HRW mounts a different loan-agreement-based attack against the section 1.7 breach-of-contract claim: Ralls's failure to satisfy a condition precedent.

### c. Conditions Precedent

Federal Rule of Civil Procedure 9 governs the pleading of conditions precedent. For actions sounding in contract, failure to perform a condition precedent is an affirmative defense. *See Gravitt v. Bank of the Ozarks*, 326 Ga.App. 461, 756 S.E.2d 695, 701 n. 8 (2014). Under Rule 9(c), a plaintiff may "allege generally that conditions precedent have occurred or been performed," but if the defendant wants to deny the occurrence or performance of a condition precedent, he "must do so with particularity." Such denials, however, "may be raised in a motion to dismiss (rather than an answer) as long as they meet Rule 9(c)'s particularity requirement." *Bloodworth v. Colvin*, 17 F.Supp.3d 1245, 1253, No. 1:12-cv-1851-TCB, 2014 WL 1711794, at *5 (N.D.Ga. Jan. 14, 2014). And once made, the burden of proving that the conditions precedent have been satisfied falls on the plaintiff. *See Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982).

In Georgia, a party must perform a condition precedent in order for the contract to become binding on the other party. O.C.G.A. § 13–3–4. Put another way, "[a] condition precedent is one which must be performed before any right to be created thereby accrues." *Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F.Supp.2d 1322, 1335 (N.D.Ga.2000) (quoting *Wolverine Ins. Co. v. Sorrough*, 122 Ga.App. 556, 177 S.E.2d 819, 822 (1970)). Parties can create conditions precedent "by language such as 'on condition that,' 'if' and 'provided,' or by explicit statements

---

12. Ralls's August 26 letter states, "The Construction Cost has now reached $3,514,041.00 as of the date hereof and the Acquisition Cost is now immediately due and payable." Whether the construction costs had actually reached $3,514,041—something that HRW contests—is a fact question that will not be considered.

that future events are to be construed as conditions precedent." *Choate Constr. Co. v. Ideal Elec. Contractors, Inc.*, 246 Ga. App. 626, 541 S.E.2d 435, 438 (2000). But Georgia law does not favor interpreting a contract to find a condition precedent; thus, "[i]f the contract's terms are clear and unambiguous and do not clearly establish a condition precedent, [courts] cannot construe the contract to create one." *Id.*

▮▮ Here, despite HRW's contrary contention, Ralls's amended complaint satisfies Rule 9(c) by alleging generally that all conditions precedent have been satisfied or waived.[13] The only question is whether this allegation is contradicted by the rest of the amended complaint and the terms of the loan documents.

HRW contends that under the loan documents, Ralls has to satisfy certain conditions precedent before declaring an event of default and accelerating the payment of the full loan amount. For example, HRW posits that its obligation to begin repaying the acquisition loan under the loan agreement depends on the satisfaction of two conditions precedent. First, the actual construction costs must exceed the trigger amount. Second, Ralls must substantiate these construction costs by complying with section 5.21 of the loan agreement, which provides in full:

> [HRW] and [Ralls] shall cooperate with each other in good faith to ascertain the specific amount of the Construction Cost

within a reasonable time after the Commercial Operation Date. [Ralls] shall produce such specific amount and provide reasonably detailed documentations to support its calculation of the Construction Cost. Unless [HRW] can provide specific reason to challenge the authenticity of such documentations or the commercial reasonableness of the amounts set forth therein, such documentations and calculation and the resultant specific amount of the Construction Cost shall be deemed to be final.[14]

Ralls does not dispute that the trigger amount constitutes a condition precedent to HRW's obligation to repay the acquisition loan. The question then is: does section 5.21 create a condition precedent to HRW's obligation to pay the excess amount due under section 1.7? It does not.

To be sure, section 5.21 calls for Ralls to provide "reasonably detailed documentations to support [its] calculation of the Construction Cost" and affords HRW an opportunity to challenge the "authenticity of such documentations" as well as the "commercial reasonableness of the amounts set forth therein." But the plain language of this section poses two problems for HRW.

First, under section 5.21, Ralls's substantiation obligation and HRW's challenge rights only come into play "a reasonable time *after* the Commercial Operation

---

13. In its reply brief, HRW notes that "Ralls has 'facts' which it alleges supports [its] assertion that it made the Acquisition Cost loan." (These facts were set out in Ralls's briefing in support of its motion to appoint a receiver.) HRW concludes that "the presence of those 'facts' in such briefs does not excuse Ralls' failure to plead such facts in its complaint," especially given the importance of this issue to Ralls's breach-of-contract claim. Rule 9(c), however, has no "importance exception."

14. The loan agreement defines "Construction Cost," referencing a construction contract executed contemporaneously, as "[$3,514,041] (such amount, as adjusted in accordance with the Construction Contract, together with any other amount incurred for any other amount incurred for any other related project development services provided by any party for the benefit of the Project, including [Ralls] ...)."

Date," which the loan agreement defines as "the date the [wind farm] commences its commercial production of electricity." Here, that date was in October 2013—nearly two months after Ralls's August 26 letter notifying HRW that the actual construction costs had exceeded the trigger amount. HRW offers no explanation for how this section can apply before the commercial operation date. Nor is one obvious.

Second, once section 5.21 is satisfied, the "specific amount of the Construction Cost shall be deemed *final*." HRW's interpretation never addresses nor accounts for the finality requirement. But the thrust of its interpretation is that section 5.21 imposes an ongoing obligation—a view that is at odds with the section's plain language.

This is not to diminish HRW's practical point: it is a "questionable business practice" for a company "to write a check for hundreds of thousands of dollars without having an opportunity to review or question the expenditures or reasonableness of charges" giving rise to this payment obligation. But if the loan documents protect HRW from such a practice, they do so

under a provision other than section 5.21 of the loan agreement.[15]

Accordingly, the loan documents attached to HRW's motion to dismiss do not contradict Ralls's allegation that it satisfied the conditions precedent to an action for HRW's nonpayment of the excess amount demanded in the February 14 letter.[16]

### d. Breach Related to the Creation of a Mutually Designated Account

Section 1.4 of the loan agreement provides for the creation of a "mutually designated" bank account for the deposit of any proceeds from the sale of electricity to San Isabel. And the parties agreed to "make commercially reasonable efforts ... to implement the letter and spirit of this provision." The sole purpose of this account, according to section 1.4, is to facilitate the calculation of the net cash flow and the repayment of the loan under the note.

As the Court is well aware, no mutually designated account was created before this case was filed. In its opposition brief, Ralls states that this is because HRW has not been reasonable or willing to carry out

---

**15.** Ralls argues that section 5.21 applies only if the actual construction costs exceed the specified amount of $3,514,041. This construction will not be considered for two reasons: first, the plain meaning of this section will not bear HRW's interpretation; and second, "Construction Cost" is defined by reference to a contract that was neither incorporated by reference into the amended complaint nor attached to HRW's motion to dismiss.

**16.** HRW also argues that Ralls did not provide "invoices ... for payment of the excess Construction Costs 'as incurred' " but instead "demanded lump sum payments to be made 'at once' many months after the costs were alleged to have been incurred, which is simply contrary to the Loan Agreement." This two-pronged argument holds no water. The first prong fails because Ralls's compliance

with section 5.21 is not a condition precedent to HRW's obligations under section 1.7.

The second prong, however, suggests a contract-construction question that need not be answered today: does section 1.7 permit Ralls to demand payment for the costs in excess of the trigger amount that were allegedly incurred over several months? Whatever the answer, it is plain that section 1.7 does not make a timely demand for payment a condition precedent to the accrual of HRW's payment obligation. Thus, Ralls's general allegation that it satisfied all conditions precedent is not contradicted by section 1.7 of the loan agreement.

Finally, HRW argues that section 5.21 requires "detailed documentations"—meaning more than one. "Documentations," however, is not a word, and it is too slender a reed to support HRW's argument that multiple proofs were required.

the letter and spirit of this provision. In its briefs, HRW asserts that the unreasonable party has been Ralls, which allegedly demanded that HRW open a "joint account." At its core, this dispute is factual and thus cannot be resolved at the motion-to-dismiss stage. Ralls has thus adequately pleaded a breach-of-contract claim under this portion of section 1.4.

### e. Breach Based on HRW's Alleged Failure to Pay Ninety–Five Percent of the Net Cash Flow on a Quarterly Basis

Based on its review of HRW's 2013 profit-and-loss statement, Ralls alleges that "Jerry Zhang has been misappropriating the [San Isabel] Revenues to fund wholly unauthorized distributions, including payments to his wife, Lucy Zhang, for purported employment services, to USIRE for alleged 'asset management fees,' and for multiple other unauthorized purposes, apparently including the defense of this action." Ralls contends that the profit-and-loss statement "reflects several hundred thousands of dollars of purported expenses that were neither permissible under the definition of 'Net Cash Flow' set forth in the Note, nor were they incurred and paid in compliance with Section 1.4 of the Loan Agreement."

In its opposition brief, Ralls contends that it has pleaded a separate breach of the note based on HRW's failure to pay ninety-five percent of the net cash flow, defined in paragraph 4 of the note as

> the payments received by [HRW] from any of its customers, including any utility company, in consideration for the electricity purchased from [HRW] minus (x) any amount paid by [HRW] for the maintenance services on the turbines and other equipment of [HRW] minus (y) any other statutory or mandatory payment made by [HRW], including tax payments.

Ralls notes that the expenses that HRW deducted from the San Isabel revenue in calculating the net cash flow were neither " 'mandatory' under the plain meaning of the word, nor were they authorized by Ralls as required by the Loan Agreement." Ralls, however, does not claim in its opposition brief that HRW's failure to comply with the authorization requirement constitutes a breach of the loan agreement. In any event, that requirement is set out in section 1.4 of the loan agreement as

> (x) any single payment in the amount in excess of $5,000 or (y) any payment that shall make the total payments in a calendar month to exceed $10,000, in either case to be made out of such mutually designated account to any third party, shall be made only upon the written approval of [Ralls].

HRW challenges whether Ralls has pleaded sufficient facts to show that it failed to met its obligation to pay ninety-five percent of the net cash flow. More precisely, HRW argues that Ralls has not pleaded that the expenses deducted from the San Isabel revenue were not "mandatory."

At its core, the parties' dispute over the adequacy of HRW's payment is a disagreement about the meaning of *mandatory,* which is undefined in the note. HRW claims that "the mandatory nature of a payment is determined by what is necessary to operate a wind farm." Ralls responds that the plain meaning of *mandatory* is not nearly this broad, but it offers no specific meaning. Neither party, however, devotes much attention to Georgia's rules of contract construction even though these rules are very much in play.

 Under Georgia law, "[a]mbiguity exists when a contract contains an uncertain meaning, is duplicitous, and indistinct, or when a word or phrase may be fairly

understood in more than one way." *Snipes v. Marcene P. Powell & Assocs., Inc.,* 273 Ga.App. 814, 616 S.E.2d 152, 155 (2005). Here, the phrase "any other statutory or mandatory payment made by [HRW], including tax payments" can be fairly understood in multiple ways. Put differently, this phrase lends support to both HRW's proposed interpretation and Ralls's response. Given the importance of this issue, the relative dearth of briefing, and the undeveloped record, the Court will not decide whether the expenses deducted in determining the net cash flow were in fact deductible under the note.

Two more points are in order. First, contrary to HRW's contention, Ralls's theory of breach can be "divined" from the amended complaint. But the fact is that paragraphs 42–48, 52–53 and count one of the amended complaint could have been more artfully pleaded. Take, for example, paragraph 53: "As a result of these unauthorized payments [those listed in the profit-and-loss statement], HRW has committed additional breaches of the Loan Agreement and Note, and is also in default under the Note." This allegation suggests that HRW breached both loan documents because it made unauthorized payments. But that theory contradicts the plain language of the note. Read in context, however, it is plausible that *unauthorized payments* is merely shorthand for "the expenses listed in the profit-and-loss statement that were both deducted in calculating the net cash flow and unauthorized prior to payment." That is, Ralls appears to allege that the profit-and-loss statement shows that HRW has committed separate breaches under the note and loan agreement. As a result, Ralls will be required to replead this portion of the amended complaint to clarify its claims.

Second, HRW's argument that the authorization requirement applies only to payments made from a mutually designated account is built on shaky ground. The argument's foundation is the phrase "payment . . . to be made out of such mutually designated account . . . shall be made only upon the written approval of [Ralls]." In context, however, this phrase appears to be ambiguous. Thus, the Court declines to adopt HRW's proposed interpretation at this time.

## 2. Count Two: Breach of the Implied Duty of Good Faith and Fair Dealing by HRW

In Georgia, every contract implies a covenant of good faith and fair dealing. *Myung Sung Presbyterian Church, Inc. v. N. Am. Ass'n of Slavic Churches & Ministries, Inc.,* 291 Ga.App. 808, 662 S.E.2d 745, 748 (2008). But this covenant does not provide an independent basis for liability; instead, it "becomes a part of the provisions of the contract . . . [and] cannot be breached apart from the contract provision it modifies." *Id.; see also* O.C.G.A. § 11-1-203.

The reason HRW offers for dismissing count two is that Ralls has failed to adequately plead a cause of action for breach of contract. Because this is not true, HRW's argument fails.

## 3. Count Three: Conversion by All Defendants

In Georgia,[17] a secured creditor like Ralls may bring an action for conversion against a debtor so long as the "property subject to its security interest is disposed of without the creditor's authorization. The elements of such a claim include the showing of a valid security interest in the debtor's property, *disposi-*

---

17. While the parties dispute what law governs this cause of action, the Court assumes without deciding that Georgia law—which Ralls favors—applies.

tion of that property, absence of the creditor's authorization for the disposition, and resulting damage to the creditor." *William Goldberg & Co. v. Cohen*, 219 Ga. App. 628, 466 S.E.2d 872, 883 (Ga.Ct.App. 1995) (emphasis added).

In Ralls's view, Defendants' conversion arises from their failure to deposit the San Isabel revenue in a mutually designated account and their use of that revenue for purposes other than repaying the loan. Even if true, Ralls's conversion claim fails. This is because the loan agreement does not grant Ralls a security interest in the San Isabel revenue. So while Ralls is a secured creditor with respect to other collateral, it cannot bring a claim for the conversion of the San Isabel revenue. Accordingly, count three of the amended complaint will be dismissed.

### 4. Count Four: Alter–Ego Liability of USIRE and Jerry Zhang

The Court assumes without deciding that Georgia law governs Ralls's claim that the corporate veils of HRW and USIRE should be pierced and that USIRE and Jerry Zhang are liable for HRW's actions under a theory of alter-ego liability.[18]

The foundational principle of corporate law is that corporations are legal entities distinct from their shareholders, directors, officers and employees. *Dep't of*

Transp. v. McMeans, 294 Ga. 436, 754 S.E.2d 61, 63 (2014). This is no less true when a corporation is wholly owned by a single individual. *Id.* Nor is this principle "altered by the fact that the sole owner uses and controls the corporation to promote the owner's ends." *Id.* Legal separateness exists because incorporation "shields individual shareholders and members from personal liability for the acts of the corporation, unless there is legal reason to pierce the corporate veil." *Id.* For this reason, "great caution should be taken by courts in disregarding the corporate entity." *Id.*

Georgia courts will disregard the corporate form if "a corporation is a mere alter ego or business conduit of a person" and the corporate form was "used as a subterfuge so that to observe it would work an injustice." *Baillie Lumber Co. v. Thompson*, 279 Ga. 288, 612 S.E.2d 296, 299 (2005) (quoting *Heyde v. Xtraman, Inc.*, 199 Ga.App. 303, 404 S.E.2d 607, 610 (1991)). Piercing the corporate veil is used to "remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility." *Id.* (quoting *Heyde*, 404 S.E.2d at 610).

To prevail under this theory, the plaintiff must "show that the shareholders disregarded the corporate entity

---

18. USIRE and Jerry Zhang contend that Georgia law does not apply to Ralls's alter-ego claims. In their view, the law of a company's state of incorporation should govern the application of the veil-piercing doctrine; thus, they contend that Colorado law governs the veil-piercing of HRW (to reach USIRE) and that Delaware law governs the veil-piercing of USIRE (to reach Jerry Zhang). As for why this is the case, however, they never say; instead, they focus their argument on the nondispositive nature of the choice-of-law provisions in the loan documents. But even if they

are correct, this does not mean that Georgia law would not apply. *See Multi–Media Holdings, Inc. v. Piedmont Ctr. 15 LLC*, 262 Ga. App. 283, 583 S.E.2d 262, 264–65 & n.1 (2003) (discussing whether veil-piercing claim against corporation was governed by the law of Georgia or the state of incorporation (Delaware) given that Georgia has yet to adopt the Restatement (Second) Conflict of Laws (1971) but instead applies traditional conflict-of-laws rules (citing *Convergys Corp. v. Keener*, 276 Ga. 808, 582 S.E.2d 84, 86–87 (2003))).

and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and owners no longer exist." *Baillie Lumber Co.*, 612 S.E.2d at 299 (quoting *Heyde*, 404 S.E.2d at 610). And to do so, the plaintiff must generally establish evidence of fraud, abuse of the corporate form, commingling of assets or corporate insolvency at the time of the transaction. *Cf. Amason v. Whitehead*, 186 Ga.App. 320, 367 S.E.2d 107, 109 (1988).

 The alter-ego doctrine rests on equitable principles and cannot be applied unless there is an inadequate remedy at law. *Baillie Lumber Co.*, 612 S.E.2d at 299. For this reason, the Georgia Supreme Court has held that insolvency—"in the sense that there are insufficient corporate assets to satisfy the plaintiff's claim"—is a "precondition to a plaintiff's piercing the corporate veil and holding individual shareholders liable on a corporate claim." *Johnson v. Lipton*, 254 Ga. 326, 328 S.E.2d 533, 535 (1985).

HRW asserts that Ralls merely avers the legal elements for piercing the corporate veil. This is incorrect. The amended complaint contains several factual allegations. For example, Ralls alleges that (1) Jerry Zhang exercises complete dominion and control over USIRE and HRW; (2) Jerry Zhang caused HRW to breach the loan agreements; (3) Jerry Zhang caused HRW to assume liabilities that it is undercapitalized to meet; (4) Jerry Zhang failed to observe corporate formalities in operating HRW and USIRE; and (5) Jerry Zhang has not claimed that USIRE (and not HRW) owns the wind farm. While many of these allegations might be insufficient standing alone, when taken together and construed in Ralls's favor they render

its claim of alter-ego liability facially plausible.

### 5. Count Five: Unjust Enrichment Against Lucy Zhang

 Ralls posits that Lucy Zhang has been unjustly enriched. In its view, her services as president of HRW were either illusory or duplicative of those USIRE provided, and she has been paid for these services with its funds. This theory is unavailing.

 Under Georgia law, to succeed on an unjust enrichment claim, the plaintiff must show that (1) a benefit was provided, (2) compensation for that benefit was not received, and (3) the failure to compensate renders the transaction unjust. *Clark v. Aaron's, Inc.*, 914 F.Supp.2d 1301, 1309 (N.D.Ga.2012). Ralls has not provided a benefit to Lucy Zhang. Even if she has been paid for her services, this benefit derives from her employment contract and was provided by HRW, not Ralls. Also, because Ralls does not have a security interest in the San Isabel revenue, it is factually impossible that it provided this benefit—her salary—indirectly. Accordingly, count five will be dismissed.

### 6. Count Six: Request for Prejudgment Attachment Against All Defendants

Ralls seeks a prejudgment attachment against the assets of all Defendants. To obtain a prejudgment attachment, Ralls must do two things: (1) show that one or more of the six statutory grounds for relief exist, *see* O.C.G.A. § 18-3-1; and (2) seek a writ of attachment in the defendant's "county of residence, if known, and, if not known, in the county wherein the property sought to be attached is located," *id.* § 18-3-9.

 Ralls has shown that at least one statutory ground for relief exists because

each Defendant resides outside of Georgia. *See id.* § 18–3–1(1). But Ralls does not allege that Defendants have any property in Georgia, so there is no basis for the issuance of a writ of attachment. *Cf. Harmon v. Wiggins*, 48 Ga.App. 469, 172 S.E. 847, 848 (1934) ("The city court of Savannah has jurisdiction of attachments against nonresidents of the state, where the writ is levied upon land within its territorial jurisdiction, and it thus acquires the right to enter a judgment in rem."). Should discovery unearth property of Defendants in Georgia, Ralls may seek a writ of attachment in accordance with O.C.G.A. § 18–3–4. Accordingly, count six will be dismissed without prejudice.

### 7. Count Seven: Equitable Accounting Against All Defendants

 Ralls requests an equitable accounting against all Defendants. In the amended complaint, Ralls alleges that HRW, USIRE and Jerry Zhang are indebted to Ralls for the full amount of the loan. Ralls also alleges that the Zhangs have converted funds that belong to it (the San Isabel revenue) and that Lucy Zhang has been unjustly enriched. Ralls asserts that it is thus entitled to an accounting from all Defendants "so that [its] rights as a secured creditor can be protected and paid." In its one-paragraph response to HRW's motion to dismiss, Ralls posits that "[b]ecause of the avoidance and misdirection of HRW and the other Defendants, [it] has no way of knowing exactly how much HRW owes." This alone, in Ralls's view, entitles it to an equitable accounting.

Ralls is wrong. Its first problem is factual: Ralls has no security interest in the San Isabel revenue.[19] Its second problem is legal: Georgia law does not support an equitable accounting under the facts of this case.

 In Georgia, an equitable accounting is "not a proceeding to which every litigant has as a right" and should be "granted only in carefully prescribed and determined circumstances." *Herring v. Std. Guar. Ins. Co.*, 238 Ga. 261, 232 S.E.2d 544, 545 (1977). One such circumstance is "where accounts are complicated and intricate," O.C.G.A. § 23–2–70(2),[20] and then only when there is no adequate remedy at law, *Faircloth v. A.L. Williams & Assocs., Inc.*, 219 Ga.App. 560, 465 S.E.2d 722, 723 (1995). Thus, "[a]n accounting is generally unnecessary in a breach of contract action where a party may utilize the discovery process and, where necessary, orders of the court to enforce compliance with discovery obligations to determine the full amounts owed under the contract." *nVision Global Tech. Solutions, Inc. v. Cardinal Health 5, LLC*, 887 F.Supp.2d 1240, 1276 (N.D.Ga. 2012).

Here, Ralls has not pleaded that the accounts are particularly complicated. Nor has it alleged that it will be unable to determine the amount owed through the discovery process. While Ralls alleges that USIRE and Jerry Zhang are alter egos of HRW and that HRW has made fraudulent transfers and diverted the San Isabel revenue for purposes other than repaying the loan, these allegations alone do not warrant subjecting HRW to an

**19.** Also, Ralls's claim that it has no way of knowing how much HRW owes would likely not withstand close scrutiny. But the current record—unlike the record on Ralls's motion for appointment of a receiver—precludes an easy explanation for why this is the case. In any event, uncertainty about the amount owed does not itself entitle Ralls to an equitable accounting.

**20.** The other five statutorily prescribed circumstances do not apply here. *See* O.C.G.A. § 23–2–70(1), (3)-(6).

equitable accounting. Accordingly, count seven will be dismissed without prejudice.

### 8. Count Eight: Fraudulent Transfers Against Lucy Zhang and USIRE

#### a. The Applicability of Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) imposes a heightened-pleading standard on plaintiffs alleging a cause of action for "fraud or mistake." They "must state with particularity the circumstances constituting fraud or mistake," but scienter may be alleged generally.

This Court has held that Rule 9(b) applies to claims for actual fraud under Georgia's version of the Uniform Fraudulent Transfer Act (UFTA) but not to claims for constructive fraud. *See Alliant Tax Credit Fund 31–A, Ltd. v. Murphy*, No. 1:11–cv–832–RWS, 2011 WL 3156339, at *5 (N.D.Ga. July 26, 2011). Yet other courts in this circuit have held that claims under the Georgia UFTA are not subject to the heightened-pleading standard of Rule 9(b). *See Nesco Inc. v. Cisco*, No. Civ.A CV205–142, 2005 WL 2493353, at *3 (S.D.Ga. Oct. 7, 2005) (refusing to apply Rule 9(b) to claims under the Georgia UFTA because such claims "bear very little relation to" common-law fraud).

Here, HRW does not contend that Rule 9(b) applies to Ralls's constructive-fraud claim. And Ralls does not dispute that its actual-fraud claim is subject to Rule 9(b). Accordingly, the Court need not weigh in on this intracircuit spilt over the applicability of Rule 9(b) to fraudulent-transfer claims under the Georgia UFTA.

#### b. Whether Ralls Adequately Pleaded Actual Fraud

The Georgia UFTA provides a cause of action for actual fraud. The pertinent part of the statute provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a credi-

tor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor.

O.C.G.A. § 18–2–74(a)(1). So to state a claim for actual fraud, Ralls must plead facts that establish that (1) it is a creditor of HRW; (2) HRW made a transfer or incurred an obligation; and (3) HRW did so with actual intent to hinder, delay or defraud Ralls.

■■■ HRW challenges whether Ralls adequately pleaded intent. In its view, the amended complaint is defective because "Ralls has failed to plead that there was an actual intent to defraud and it has not plead sufficient facts which support finding 'badges of fraud' as set forth in O.C.G.A. § 18–2–74(b)."

This argument fails for two reasons. First, even when Rule 9(b) applies, intent may be alleged generally, and Ralls meets this obligation. *See* FED.R.CIV.P. 9(b) ("Malice, intent, knowledge and other conditions of a person's mind may be alleged generally."). Second, the Georgia UFTA enumerates eleven factors—called *badges of fraud*—that aid courts in determining whether actual fraud exists. *See* § 18–2–74(b); *SRB Inv. Servs., LLLP v. Branch Banking & Trust Co.*, 289 Ga. 1, 709 S.E.2d 267, 270 (2011). Several are relevant here. And because the Georgia UFTA treats badges of fraud as "relevant evidence as to the debtor's actual intent," a factfinder could infer that HRW intended to defraud Ralls. *SRB Inv. Servs.*, 709 S.E.2d at 270 (quoting *Bishop v. Patton*, 288 Ga. 600, 706 S.E.2d 634, 641 (2011)) (internal quotation marks omitted).

#### i. The Transfers Were to Insiders

The Georgia UFTA defines *transfer* as "every mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance." O.C.G.A. § 18–2–71(12). This definition is thus broad enough to include HRW's payment of Lucy Zhang's salary and USIRE's asset management fee—even if no funds have actually been transferred to them.

These transfers were to insiders of HRW. When, as here, the debtor is a corporation, the UFTA's definition of *insider* includes "[a] person in control of the debtor" and "[a] relative of a general partner, director, officer, or person in control of the debtor," O.C.G.A. § 18–2–71(7)(B), where *relative* includes spouses, *id.* § 18–2–71(11). As HRW's sole member, USIRE is a person in control. And Lucy Zhang, the wife of Jerry Zhang who is the sole member of USIRE, is a relative of a director, officer or person in control of HRW.

### ii. The Transfers Left HRW Presumably Insolvent

Ralls alleges that the transfers to Lucy Zhang and USIRE left HRW without adequate assets to meet its obligations as they came due and that HRW became insolvent shortly after making these transfers. For support, Ralls cites HRW's 2013 profit-and-loss statement. HRW contends that the amended complaint is devoid of any facts related to its assets and that insolvency cannot be based on a single profit-and-loss statement indicating "negative cash flow" or "negative income."

While the amended complaint lacks specific allegations about the fair market value of HRW's assets, this alone does not preclude Ralls from adequately pleading the insolvency badge of fraud. Indeed, under Georgia law, "[a] debtor who is generally not paying his or her debts as they become due is presumed to be insolvent."

O.C.G.A. § 18–2–72(b). This is what Ralls alleges.

HRW responds that the only possible debt that it has not paid is its obligation to remit ninety-five percent of the quarterly net cash flow to Ralls—a debt that is indefinite (i.e., varies with the San Isabel revenue) and is itself subject to dispute. HRW contends that it cannot be presumed to be insolvent based on its alleged failure to pay a single debt as it comes due. Indeed, as HRW points out, it has been paying its debts to the power, Internet and insurance companies, among others.

While colorable, HRW's argument is insufficient at the motion-to-dismiss stage. Underlying HRW's argument is an assumption that there is no debt currently due to Lucy Zhang and USIRE. At present, however, Ralls's allegations related to the expenses listed in the profit-and-loss statement—which include Lucy Zhang's salary and USIRE's asset management fee—are presumed to be true. And when construed in Ralls's favor, the amended complaint permits the inference that HRW was presumably insolvent not long after making these transfers. Hence, Ralls has sufficiently established the insolvency badge of fraud.

### iii. The Transfers Occurred Shortly After a Substantial Debt Was Incurred

In March 2013, HRW executed the loan documents, assuming a debt of just over $13.4 million. Both Lucy Zhang's employment contract and USIRE's asset management agreement are alleged (or implied) to have been executed around this time—an allegation that HRW does not dispute. Because these transfers occurred shortly after HRW incurred a substantial debt, Ralls has adequately pleaded another

badge of fraud. *See* O.C.G.A. § 18–2–74(b)(10).

\* \* \*

Taken together, these badges of fraud provide a basis for inferring that the transfers were fraudulent within the meaning of the Georgia UFTA. This is enough to adequately state a claim for actual fraud and for relief against Lucy Zhang and USIRE under O.C.G.A. § 18–2–77.[21]

### c. Whether Ralls Adequately Alleged Constructive Fraud

The Georgia UFTA also provides a cause of action for constructive fraud. To state such a claim, Ralls must show that HRW

(1) made a transfer or incurred an obligation (2) without "receiving a reasonably equivalent value in exchange for the transfer or obligation," and (3) either:

(a) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction (O.C.G.A. § 18–2–74(a)(2)(A));

(b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due (O.C.G.A. § 18–2–74(a)(2)(B)); or

(c) was insolvent at that time or became insolvent as a result of the transfer (O.C.G.A. § 18–2–75(a)).

*Akanthos Capital Mgmt., LLC v. Compu-Credit Holdings Corp.*, 770 F.Supp.2d 1315, 1333 (N.D.Ga.2011) (footnote omitted), *rev'd on other grounds*, 677 F.3d 1286 (11th Cir.2012).

HRW has undoubtedly made a transfer or incurred an obligation to Lucy Zhang and USIRE. HRW contends, however, that Ralls fails to state a claim for constructive fraud because the amended complaint includes only conclusory allegations, and Ralls does not allege that these transfers reflect fees for services that were unperformed, unnecessary or too high. HRW also reiterates its argument that insolvency was inadequately pleaded.

These arguments are unavailing. First, HRW's presumptive insolvency has been adequately pleaded. Second, whether a transaction's benefits constitute "reasonably equivalent value" depends on the facts. *Cf. Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1311 (11th Cir.2012) (noting the longstanding rule that whether the benefits of a transaction were fair is largely factual). Until discovery is complete, Ralls likely will not know what services Lucy Zhang and USIRE perform. In any event, a plaintiff alleging constructive fraud need only meet the pleading requirements of Rule 8(a)(2), and when construed in the light most favorable to Ralls, the amended complaint raises Ralls's right to relief under O.C.G.A. § 18–2–77 above the speculative level.

### 9. Count Nine: Civil Conspiracy Against Jerry Zhang and Lucy Zhang

In Georgia, a civil conspiracy exists when two or more persons agree "to do some unlawful act which is a tort or else to do some lawful act by methods which constitute a tort." *Summer–Minter & Assocs. v. Giordano*, 228 Ga. 86, 184 S.E.2d 152, 154 (1971). The essence of a

---

**21.** Ralls contends that the amended complaint contains allegations that support finding two other badges of fraud: concealment of the transfer or obligation and failure to receive reasonably equivalent value in exchange for the asset transferred or obligation incurred. O.C.G.A. § 18–2–74(b)(3), (8). Having found that three badges of fraud exist, the Court need not consider these additional badges of fraud.

civil-conspiracy claim is "the charge of a common design." *Willson v. Appalachian Oak Flooring & Hardware Co.,* 220 Ga. 599, 140 S.E.2d 830, 836 (1965). "Where several persons conspire to defraud another, one or all of the wrongdoers may be sued, and proof of the conspiracy renders the act of one in deceiving and defrauding the injured party the act of all." *Id.* Without an underlying tort, however, there is no liability for civil conspiracy. *Miller v. Lomax,* 266 Ga.App. 93, 596 S.E.2d 232, 242 (2004). In other words, the mere existence of a conspiracy does not create a cause of action.

 In its opposition brief, Ralls argues that "the Zhangs' course of conduct of self-dealing and insider contracts clearly demonstrates their agreement to act in concert to damage Ralls through conversion of the [San Isabel] revenues." The Zhangs view this statement as a concession that Ralls's civil-conspiracy claim stands or falls with its conversion claim. They are mistaken.

To be sure, the amended complaint and Ralls's opposition brief reference the "conversion" of the San Isabel revenue. And because that tort claim fails, it cannot support a civil-conspiracy claim. But this does not end the analysis.

 In Georgia, when two or more persons participate in a scheme to effect fraudulent transfers, they may be held liable for civil conspiracy. *See Miller,* 596 S.E.2d at 242 (reversing summary judgment for transferee because a jury ques-

tion remained as to whether she "participated with [the transferor] in a scheme to effect fraudulent transfers" under the Georgia UFTA). Indeed, Georgia law focuses on whether the defendants conspired to effect the fraudulent transfer, not their status as a debtor or transferee. *See Chepstow Ltd. v. Hunt,* 381 F.3d 1077, 1090 (11th · Cir.2004) (reversing Rule 12(b)(6) dismissal of civil-conspiracy claim against nontransferee defendant who allegedly conspired with judgment debtor to defraud creditor by hindering collections of an outstanding debt).

Ralls has adequately stated a claim under Georgia's UFTA. While HRW allegedly made these fraudulent transactions, they were physically carried out by Jerry Zhang. And Ralls alleges that he did so in concert with his wife. Taken together, this is enough to survive the Zhangs' motion to dismiss. It is also enough to keep alive Ralls's claim for punitive damages under O.C.G.A. § 51–12–5.1.

### 10. Attorney's Fees

Ralls alleges in the amended complaint that it is entitled to attorney's fees because its initial complaint put HRW on notice of its intention to enforce the attorney's fee provision in the note and that HRW had ten days from when the complaint was served to pay "the sums due, as well as any additional interest or other charges that might have accrued prior to the tender of payment in full" to avoid liability.[22] HRW made no such payment, so Ralls alleges that it is entitled to attorney's fees under the note and O.C.G.A. § 13–1–11.

---

22. In full, paragraph 33 of the original complaint states:

> HRW is hereby notified, pursuant to O.C.G.A. § 13–1–11, that Ralls intends to enforce the attorneys' fees provisions in the Notes and it has ten (10) days from the date of service of this Complaint within which to pay the sums due, as well as any additional interest or other charges which may accrue

prior to the tender of payment in full without also being liable for attorneys' fees. HRW can avoid the obligation to pay attorneys' fees by paying the sums owed and any other charges which may accrue prior to the tender of payment in full, within ten days after the date of service of this Complaint.

In the alternative, Ralls alleges that it is entitled to attorney's fees under O.C.G.A. § 13–6–11. It claims that "by failing to open and administer an account mutually designed by Ralls and HRW and remit to Ralls the [San Isabel] Revenues, HRW has been stubbornly litigious, and HRW has caused Ralls unnecessary trouble and expense."

HRW does not argue that Ralls's initial complaint cannot be used to satisfy the notice requirement of § 13–1–11(a)(3). Nor could it. *See Fas Capital, LLC v. Carr*, 7 F.Supp.3d 1259, 1269, No. 1:11–cv–3224–JEC, 2014 WL 1153789, at *9 (N.D.Ga. Mar. 20, 2014) ("Georgia law permits notice under § 13–1–11 to be given through a complaint.") (collecting cases).

Instead, HRW argues that Ralls failed to provided statutorily sufficient notice because the initial complaint was "fatally flawed." In HRW's view, its original motion to dismiss demonstrated that no event of default had occurred, and absent an event of default, the loan could not have been accelerated. HRW thus concludes that "Ralls' demand in its initial Complaint that HRW pay the entire Loan amount so as to avoid the imposition of attorneys' fees is statutorily insufficient notice."

Ralls dismisses HRW's argument out of hand: "HRW of course cites no authority for this unique proposition that a notice can be deemed inadequate merely because HRW says it is."

■ The bigger problem with HRW's argument is not its lack of support or its reliance on *ipse dixit*. It is more subtle. Normally, debtors attack the sufficiency of the notice by challenging its timeliness, method of delivery or contents. This is not surprising given that the notice provision's purpose is "to provide debtors with the opportunity to avoid the contractual obligation to pay the creditor's attorney fees by allowing the debtor a last chance to pay the balance of the debt and avoid litigation." *Austin v. Bank of Am., N.A.*, 293 Ga. 42, 743 S.E.2d 399, 407 (2013). Indeed, Georgia law is clear that substantial compliance with this provision is "a 'mandatory condition precedent' to the recovery of attorney fees under that statute." *Best v. CB Decatur Court, LLC*, 324 Ga.App. 403, 750 S.E.2d 716, 720 (2013) (quoting *Core LaVista, LLC v. Cumming*, 308 Ga.App. 791, 709 S.E.2d 336, 342 (2011)).

HRW's argument springs from the language of the notice provision, which provides in pertinent part:

> The holder of the note or other evidence of indebtedness or his or her attorney at law shall, *after maturity of the obligation*, notify in writing the maker, endorser, or party sought to be held on said obligation that the provisions relative to payment of attorney's fees in addition to the principal and interest shall be enforced and that such maker, endorser, or party sought to be held on said obligation has ten days from the receipt of such notice to pay the principal and interest without the attorney's fees.

O.C.G.A. § 13–1–11(a)(3) (emphasis added). The need for statutory notice is thus conditioned on "maturity of the obligation." For this reason, HRW bypasses the traditional insufficient-notice targets and takes aim at Ralls's warrant for providing notice in the first place: the occurrence of an event of default, which in turn triggers Ralls's right to accelerate the entire loan amount.

But HRW's challenge fails for at least two reasons. First, it is unnecessary. If HRW is correct that no default occurred, then there is no debt for Ralls to collect, and § 13–1–11 does not apply at all. Second, it is premature. Whether Ralls had

the right to demand payment of the entire loan amount when it filed its initial complaint depends on facts outside of the amended complaint and documents attached to HRW's motion to dismiss. Thus, the time for HRW to raise this challenge is on summary judgment.

HRW's argument against Ralls's alternative claim for attorney's fees under O.C.G.A. § 13–6–11 fails for the same reasons. If HRW did not default on its obligations, then it will have been righteously rather than stubbornly litigious, and § 13–6–11 will not apply. And whether HRW's conduct precludes the application of this statute will turn on facts outside of the record. HRW's challenge must therefore wait for summary judgment.

## IV. Conclusion

Ralls's amended complaint states a claim for relief under counts one, two, four, eight, nine and ten: breach of contract against HRW; breach of the implied duty of good faith and fair dealing against HRW; alter-ego liability against USIRE and Jerry Zhang; fraudulent transfers against USIRE and Lucy Zhang; and civil conspiracy against Jerry and Lucy Zhang. Also, Ralls's claims for attorney's fees and punitive damages survive.

Ralls cannot state a claim for relief under counts three and five: conversion against all Defendants and unjust enrichment against Lucy Zhang. Counts three and five are thus DISMISSED WITH PREJUDICE.

Ralls has failed to state a claim for relief under counts six and seven. These counts are DISMISSED WITHOUT PREJUDICE.

Accordingly, USIRE and the Zhangs' motion to dismiss for lack of personal jurisdiction and for failure to state a claim [29] is GRANTED IN PART AND DE-NIED IN PART. HRW's motion to dismiss for failure to state a claim [30] is GRANTED IN PART AND DENIED IN PART.

Ralls is ORDERED to file a second amended complaint within fourteen days of this Order. Ralls must replead its breach-of-contract claims related to HRW's miscalculation of the net cash flow and failure to receive preauthorization before making certain payments in violation of section 1.4 of the loan agreement. Additionally, the second amended complaint should be consistent with this Order.

